# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 16, 2013 Session

## STATE OF TENNESSEE v. DOMINIC LYONS

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1735       Cheryl Blackburn, Judge**

---

**No. M2012-01635-CCA-R9-CD - Filed May 2, 2013**

---

In this interlocutory appeal, the State challenges the trial court's ruling suppressing the out-of-court identification of the defendant via a photograph array and the subsequent in-court identification by the same witness at the suppression hearing. The State contends that the trial court erred by deeming the identification procedure unduly suggestive. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 9; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and PAUL G. SUMMERS, SR. J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Megan King, Assistant District Attorney General, for the appellant, State of Tennessee.

Sunny Eaton and Richard McGee, Nashville, Tennessee, for the appellee, Dominic Lyons.

## OPINION

The offenses giving rise to this case occurred on April 6, 2010, at the Atlantis Nightclub in Nashville. On that night, the defendant argued with the security guard at the club after the guard denied the defendant entry for failure to conform to the dress code. Later that evening, a car drove past the Atlantis Nightclub, and a passenger in the car fired a gun toward the entrance of the club. One person, Jessica Gates, identified the defendant as the shooter from a photograph array shown to her by Detective Larry Peck. The defendant filed a motion to suppress Ms. Gates's identification, arguing that the procedure utilized by Detective Peck was unduly suggestive. Following a hearing conducted in three parts, the

trial court agreed with the defendant and suppressed the identification. The trial court later granted the State permission to seek interlocutory review of its order via Rule 9 of the Tennessee Rules of Appellate Procedure, and this court granted the State permission to appeal.

In this interlocutory appeal, the State contends that the trial court erred by suppressing Ms. Gates's identification of the defendant, claiming that the procedure employed by Detective Peck was not unduly suggestive. The defendant asserts that the trial court did not err.

At the suppression hearing, Detective Larry Peck of the Metropolitan Nashville ("Metro") Police Department testified that he was called to investigate a shooting at the Atlantis Nightclub on April 6, 2010. He said that he learned from witnesses that the defendant had argued with the club's bouncer, Ira Thompson, after Mr. Thompson denied him entry into the club because he was not wearing appropriate footwear. The defendant left and returned a second time to request entry. Mr. Thompson again denied him entry based upon the earlier kerfuffle, and the defendant "became upset and ripped down the curtain to the club and walked off." A short time later, a dark-colored car drove by, and a passenger in the car fired several shots at the entrance of the club, striking two people.

Based on information that the defendant had been involved in an argument at the club, Detective Peck included his photograph in a photograph array that he showed to Jessica Gates, who other witnesses claimed had "gotten a good look at the suspect." During this first showing, which occurred on the day following the shooting, Ms. Gates did not identify the defendant or any other person as the shooter. Detective Peck said that he doubted Ms. Gates's honesty because "it was clear and compelling to [him] that she actually saw, you know, the shooter that night." According to Detective Peck, he telephoned Ms. Gates three weeks later and asked her to come to the police station so that he could "talk to her about the case and things like that." He said that he did not recall Ms. Gates's giving him any information over the telephone.

Detective Peck testified that during this second encounter, which was recorded, he told Ms. Gates that she had failed to identify the suspect from the first photograph array, and "[s]he said, yeah, I know it was number four right about that time." He said that this revelation indicated to him that Ms. Gates had "misled the investigation on purpose for whatever her reasons were." He said that "just to cover all angles," he showed the same photograph array to Ms. Gates a second time. At that time, she pointed to "number four and stated that was him." He insisted that he did not call Ms. Gates to the station on April 21 to show her the photograph array but to "really bring out the truth because . . . [he] knew she was lying or holding back." He claimed that he did not seek a warrant for the defendant's

arrest based upon Ms. Gates's identification but "based on the fact that she pretty much lied to me the first time and she already knew who he was."

During cross-examination, Detective Peck admitted that the only description Ms. Gates provided of the shooter was that he was a light-skinned black male wearing a hat. He said that surveillance video showed a number of people and cars near the front entrance of the night club when the shots were fired. He testified that the first photograph array he showed to Ms. Gates was in color and that the defendant's picture was in the number four position. He also showed the same array to several other witnesses. Those witnesses, he conceded, identified the defendant as the person who argued with the bouncer at the night club, but none of them identified the defendant as the shooter. Ms. Gates did not identify the defendant as either the person who started the argument or as the person who fired the shots. During the ensuing three weeks, Detective Peck received information that the defendant was at the night club on the night of the shooting and that the defendant was not the only individual ejected from the club that night. Detective Peck acknowledged that there was media coverage of the shooting during that same time period.

Detective Peck reiterated that he contacted Ms. Gates prior to her coming to the police station on April 21. He denied that Ms. Gates mentioned the photograph array during their telephone conversation, explaining that he "kept it brief so she wouldn't run from me or hang up the phone or what is it people who become uncooperative do." He said that when she entered the interview room, she told him that the shooter was "number four" before she was shown the photograph array. He acknowledged that, at that point, he showed her the same photograph array, albeit in black and white, that he had shown her on April 7. That array included the defendant's photograph in position number four. He admitted telling Ms. Gates that "she saw the shooter."

Detective Peck admitted that the defendant was the focus of his investigation despite information that another person may have been involved. He claimed that although his report mentioned only a single tip that the defendant was the shooter, he actually had multiple tips leading him to suspect the defendant.

Metro Detective Dean Haney testified that he had worked as a police officer for over 31 years and had investigated more than 1,000 cases involving an eyewitness identification made from a photograph array. Detective Haney said that he was not involved in the investigation of the Club Atlantis shooting but was asked to review the identification procedure by the defendant. During his review, he examined the photograph array, in black and white form, and the video recording of the identification made by Ms. Gates on April 21, 2010. Detective Haney said that during that identification, Detective Peck told Ms. Gates that she "got a pretty good look at the guy" and that she had failed to identify their "target

subject" when she first viewed the array. Detective Haney said that both statements should not have been made because "it pretty much suggests that your suspect is in that line-up and you did not pick him out." He testified that making such a statement was a direct violation of departmental policy regarding photograph arrays. He said that detectives also violated departmental policy by telling Ms. Gates that if the defendant was not "put off the street he could do it again, next time it could be you." Detective Haney said that this statement "show[ed] some type of . . . coercion." Detective Haney said that the greatest problem with the identification procedure was "the suggestiveness of saying that you did not pick the person, letting them know that the person is in that line-up."

During cross-examination, Detective Haney testified that it was his belief that Ms. Gates's identification of the defendant from the photograph array was tainted.

A video recording of Ms. Gates's identification of the defendant was exhibited to the suppression hearing. In the video, Ms. Gates denies being frightened when viewing the photograph array on April 7, 2010. Detective Peck told her that it was his opinion that she "got a pretty decent look at the guy" and that "[t]he target subject [police] were looking at, you didn't pick him out." At that point, Ms. Gates said that she "had been thinking about" her failure to make a positive identification from her first viewing of the array, that she could "remember the lineup," and that the "number that [she] can think of . . . is four." When asked why she did not pick the individual in position number four during her first viewing of the array, she said that she did not know but that "after trying to think about it . . . it's number four." She said that she was "about 95 percent" certain that the individual in position number four was the shooter.

When Detective Peck left the room to retrieve a copy of the photograph array, another detective told Ms. Gates that she was "the best witness" and that she had already indicated that "the guy that argued was the shooter." He told her that it was important for her to make an identification because "he may do it again and it may be you." When shown the photograph array, this time in black and white, Ms. Gates said, "I still say four." At that point, Detective Peck asked her to provide a statement and to give a reason why she did not make an identification the first time she was shown the array so that police could "make it clear" that she had not been coerced to make an identification. After she made the identification, the other detective confirmed that other information indicated that the defendant was the shooter and that, in fact, the defendant "had been trying to apologize" for shooting Ms. Gates's friend.

Jessica Gates testified that she witnessed a shooting at Club Atlantis on April 6, 2010, and identified the defendant as the shooter. She said that she first saw the defendant "arguing in the doorway of Atlantis" as she stood outside to use the telephone. She said that

-4-

she observed the defendant "between fifteen to twenty minutes" and that she got a good look at him. She said the area was well lit despite the late hour. She said that she was near the curb when she saw "a black tinted car pull up" and then "the windows were rolled down." She said that she "saw the gun and the beam and shots were fired." She said that she was facing the car and so close that she "could touch the car." She said that there was nothing between her and the car but empty space. The defendant, she said, was seated in the passenger's seat holding the gun.

She said that approximately one hour after the shooting she met Detective Peck at an Eckerd store "off West End to speak." She testified that she told Detective Peck that she "saw the black Grand Prix, the tinted window," but she had not, at that point, "made the connection between the argument and the shooter." She did, however, provide "a very vivid description of . . . . the car, the gun, the shooting." Ms. Gates testified that she spoke with Detective Peck "[n]umerous times" between the initial interview at the Eckerd and the interview when she was first asked to view the photograph array on April 7, 2010. She claimed that Detective Peck telephoned her "just to make sure that . . . [she] was okay" and that she telephoned him to "follow up" because she "was really concerned about what was going on." She said, "So as things was coming back to me – I was calling him literally like every fifteen minutes, okay, I remember this, okay, I remember that." She testified that one detail she provided during their many conversations was that the shooter was the same individual who argued with the bouncer outside Club Atlantis.

Ms. Gates testified that she spoke with Detective Peck and another detective on April 7, 2010, at an apartment where she was staying with her brothers. It was during that meeting that she was shown "more than one sheet of pictures" with "six pictures on a page." She said that she told Detective Peck that she "thought [she] could identify" the shooter from one of the photograph arrays but that she was "not a hundred percent sure." She said she "gave him it's possible, but . . . did not give him a hundred percent guarantee." Ms. Gates testified that the meeting "ended well" with Detective Peck "laugh[ing] it off" that she was unable to make an identification.

According to Ms. Gates, she spoke with Detective Peck "a few weeks or so after" the shooting and told him that she had "been really thinking about it, and it's number four." She said she begged the detective to allow her to "come back up there to . . . look at the pictures again to be able to show you." She testified that the detective relented, and she went to the police station that same day. Ms. Gates claimed that she was able to make the identification because she had taken "some days to [her]self . . . . just sitting there really trying to replay what was going on and exactly what happened." Ms. Gates said that she did not feel pressured by detectives to make the identification and that she did not make an identification when shown the array on April 7 because she "wasn't mentally ready at that

point to say what was going on." She claimed that "a lot of stresses and factors . . . played into identifying," including the fact that one of her close friends had been injured in the shooting. She denied seeing any media coverage of the shooting.

During cross-examination, Ms. Gates testified that the detectives provided her with more than one photograph array to examine on April 7, 2010, that they provided her plenty of time to look at the photographs, and that she "didn't feel pressured to do anything." She admitted that she was unable to identify either the man who was arguing with the bouncer or the shooter. Ms. Gates denied drinking alcohol or smoking marijuana on the night of the shooting or at the time she made the identification on April 21, 2010. Ms. Gates admitted, however, that she had posted on Twitter that she was "wasted" on the evening before going to court for the suppression hearing. She acknowledged that she had active accounts on Twitter and Facebook at the time of the shooting and that many of her friends discussed the shooting via these social media outlets. Ms. Gates said that she did not watch television between the night of the shooting and the day she made the identification, but she conceded that she may have seen media coverage of the shooting on social media.

Ms. Gates agreed that she had spoken to detectives "multiple times" between April 7, 2010, and the date on which she and Detective Peck discussed her returning to the police station to view the photograph array a second time. Ms. Gates was adamant that she viewed more than one photograph array on April 7, 2010, but she was unable to explain how Detective Peck knew which of those she was referring to when she said the shooter was "number four." She said,

> I told him number four – that may be correct. But however – not, let me – if I can finish to explain my thought to clear it up. When I told him number four, I did not give a – from this particular page. However I spoke to him and it was clear in the conversation when we had – because I cannot remember now if it was the color picture or the black and white picture but we both knew – no, excuse me, I knew who I was speaking of. So whether or not he knew what the number four I was talking about did not - when I got there, I pointed exactly to [the defendant].

Ms. Gates said that she could not remember how many photograph arrays she viewed on April 21, 2010.

Ms. Gates admitted that people with whom she communicated on Facebook and Twitter knew that she was involved in the investigation because they saw her speaking

to police outside the club following the shooting.  She then claimed,

> [P]eople that saw me speaking to them and actually . . . it was
> my brothers.  My brothers, only one of them has a Twitter and
> did not get a Twitter account until the year after that this
> incident happened.  And everyone else there does not have a
> Facebook – they have a Facebook but a Twitter account.  And
> those people were not Facebook and/or Twitter because they
> were with me.

Upon questioning by the court, Ms. Gates testified that she "believe[d]" that she had provided police with a description of the person who argued with the bouncer but that she could not recall the description "verbatim."  She said that all she could recall of that person, who she claimed was the person who later fired the shots, was that "[h]e was light skinned, medium height, slender."  She admitted that there was "nothing distinctive" about the shooter's appearance.  When pressed by the court for a more detailed description, Ms. Gates claimed to have "been sideswiped" by the questions, explaining, "[I]f you ask me fifty questions to make me lie, then it's going to confuse me and throw me off."  She told the court that she failed to make an identification the first time she viewed the photograph arrays because she "was honestly stressed out."  She vehemently maintained that she viewed more than one photograph array on April 7, 2010, and she said that she viewed only a single photograph array on April 21, 2010.  She acknowledged that she knew that police were targeting a particular individual when she viewed the photograph array on April 21.

Upon further cross-examination by the defense, Ms. Gates acknowledged that she did not provide a description of the shooter in the handwritten statement she provided to police on the night of the shooting.  She also admitted that she did not tell police that the person who had argued with the bouncer was also the shooter, claiming that she did not do so because "at that time [she] had not made the connection."

In its written order granting the defendant's motion to suppress, the trial court concluded that although the photograph array was not itself suggestive, "the procedure used for the subsequent identification was unduly suggestive."  The court found that during Ms. Gates's second viewing of the array, Detective Peck "violated procedure by letting her know the target was, in fact, included in the photographs."  The court also found that Ms. Gates's reference to the shooter's being "Number 4" was not a positive identification because "Ms. Gates adamantly testified that she had been shown 'sheets' of photographs, indicating she had been shown more than one photo array with pictures numbered one through six."  The court concluded that the "'identification' is further compromised by the fact that the same photo array had been shown to multiple witnesses who could not identify the shooter but had

identified 'Number 4' as the person arguing outside the club." These witnesses, including Ms. Gates, the court observed, were all friends who attended Tennessee State University and who had the opportunity to confer with one another prior to Ms. Gates's making the identification on April 21. The court determined that "the totality of the evidence does not support an independent basis for the subsequent identifications." Finally, the court held that, "due to both the suggestive nature of the second viewing of the photo array coupled with the fact . . . no evidence indicated Ms. [Gate's] independent basis for making the identification after her initial non-identification," Ms. Gates would be permitted to testify about her observations on the night of the shooting but "her second identification and her in-court identifications at the preliminary hearing and suppression hearing" would not be admissible and she would not be permitted to make an in-court identification of the defendant at trial.

We review the State's challenge to the trial court's order with a few, well-settled principles in mind. A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We review the issue in the present appeal with these standards in mind.

An identification procedure that is so impermissibly suggestive "as to give rise to a very substantial likelihood of irreparable misidentification" violates due process. *Simmons v. United States*, 390 U.S. 377, 384 (1968). In *Simmons*, the Court observed that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." *Id.* at 383. Noting that "[e]ven if the police subsequently follow the most correct photographic identification procedures . . . , there is some danger that the witness may make an incorrect identification," the Court concluded that the danger of misidentification "will be increased if . . . the photograph of a single such individual recurs or is in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id.* Although it may be suggestive, an identification may satisfy due process as reliable and admissible if the totality of the circumstances so warrants. *See State v. Brown*, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990). Following *Simmons*, the Court established a two-part analysis to assess the validity of a pre-trial identification. First, the trial court must determine whether the identification procedure was unduly suggestive. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). If the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was

nonetheless reliable. *Id.* at 198-99. Five factors are to be considered when evaluating the propriety of the identification process: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id*. at 199-200.

Utilizing these standards, we conclude that the record fully supports the trial court's suppression of Ms. Gates's out-of-court and in-court identifications of the defendant. As the trial court pointed out, the testimony provided by Ms. Gates and Detective Peck was rife with conflict. For example, although Detective Peck testified that he believed Ms. Gates to be uncooperative, Ms. Gates insisted that she telephoned the detective frequently to provide information and follow up on the investigation. In addition, Detective Peck testified that Ms. Gates was shown only one photograph array on April 7, 2010, but Ms. Gates was adamant that she had been shown several arrays. Moreover, as the trial court observed, Ms. Gates was completely unable to explain how Detective Peck could have known which array she was referring to when she told him, prior to viewing the photograph array on April 21, 2010, that she believed the shooter to be the individual in position number four.

In making its ruling, the trial court relied heavily on the video recording of the April 21, 2010 interview. That recording, which is included in the record on appeal, clearly establishes that Detective Peck told Ms. Gates, prior to showing her the photograph array, that the picture of the suspect had been included in the array and that she had failed to choose it. Then, while Detective Peck was gone to retrieve the array to show it to Ms. Gates a second time, another detective told Ms. Gates that she was the "best witness" and that it was important that she make an identification because the perpetrator might strike again and that she might be the next victim. Finally, after Ms. Gates identified the defendant from the array, that same detective praised her for choosing correctly and told her that other information confirmed that she had correctly identified the shooter.

As the video recording demonstrates, the identification procedure in this case violated several of the principles announced in *Simmons*. Ms. Gates was informed prior to viewing the array that the suspect's photograph was included, and she was shown the exact same array, with the defendant's photograph appearing in position number four, two times. *See Simmons*, 390 U.S. at 383. Then, after she had made her selection, Ms. Gates was told that she had chosen correctly, as other evidence suggested the defendant's guilt. *See id.* Thus, the trial court properly concluded that the identification procedure was unduly suggestive.

Having concluded that the procedure was unduly suggestive, the trial court then

ruled that the identification was not otherwise admissible as reliable because "the totality of the evidence does not support an independent basis for the subsequent identifications." Again, the record fully supports the decision of the trial court. Although Ms. Gates claimed to have provided a "vivid" description of the shooter immediately after the shooting, the record belied her claim. The description she provided in her first interview of the person who was driving the car, and that description was vague, at best. She described him only as a light-skinned black male. She admitted that she did not tell officers that the person who argued with the bouncer was also the shooter, claiming that she only made the connection herself just before going for the April 21, 2010 interview. She failed to make an identification during her first viewing of the photograph array, which took place only a short time after the shooting.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE